John Wesley CLUTCHETTE et al.,
Plaintiffs-Appellees,

v.

Raymond J. PROCUNIER et al.,
Defendants-Appellants.

No. 71–2357.

United States Court of Appeals,
Ninth Circuit.

April 25, 1974.

Rehearing Granted July 29, 1974.

810

William D. Stein, Deputy Atty. Gen. (argued), Evelle J. Younger, California Atty. Gen., San Francisco, Cal., for defendants-appellants.

* Fifth Circuit, sitting by designation.

1. The district court declared that "the disciplinary procedures employed at San Quentin Prison violate the due process and equal protection clauses of the 14th amendment by failing to provide for adequate notice of charges, the calling of favorable witnesses

William Bennett Turner (argued), San Francisco, Cal., John E. Thorne, San Jose, Cal., Floyd Silliman, Silliman & House, Salinas, Cal., Fay A. Stender, Franck, Hill, Stender, Hendon, Kelley & Larson, Berkeley, Cal., for plaintiffs-appellees.

## OPINION

Before TUTTLE,* HUFSTEDLER and KILKENNY, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Plaintiffs, who are inmates of San Quentin state prison, filed a civil rights class action challenging the constitutionality of the prison's disciplinary procedures. The district court held that the procedures violated the due process and equal protection clauses of the Fourteenth Amendment and granted the plaintiffs declaratory,[1] injunctive, and other relief. The prison authorities have appealed.

The issues on appeal, phrased broadly, are these: (1) Did the district court lack jurisdiction either because 28 U.S. C. § 2281 compelled convening a three-judge court to consider the constitutional issues or because Preiser v. Rodriguez (1973), 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439, required the plaintiffs to exhaust state remedies before resort to the district court? (2) Do the protections of the due process clause extend to prisoners who were subjected to the challenged disciplinary procedures? (3) What process is due these prisoners in the context of San Quentin's disciplinary system?

## I.

■ We agree with the district court that a three-judge panel did not

and cross-examination of accusing witnesses, counsel or counsel-substitute, a decision by a fact finder uninvolved with the alleged incident, a written finding of facts, or uniform notice of any right to appeal the decision, when such a disciplinary hearing may result in grievous loss to the prisoner[.]" (328 F.Supp. 767, 784–785.)

have to be convened to hear the cause. Section 2281[2] does not apply to a suit to enjoin enforcement of regulations that have local, rather than "statewide application." (Board of Regents v. New Left Education Project (1972), 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697; Moody v. Flowers (1967), 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643; Hatfield v. Bailleaux (9th Cir. 1961), 290 F.2d 632.) The plaintiffs' attack is limited to procedures conducted within the walls of San Quentin, and San Quentin's rules do not apply statewide. (*Compare* Hatfield v. Bailleaux, *supra* (three-judge court not required when regulation challenged applied only to single Oregon prison), *with* Gilmore v. Lynch (9th Cir. 1968), 400 F.2d 228 (three-judge court required where regulation challenged established rules for every prison in California). *See also* Sands v. Wainwright (5th Cir. 1973), 491 F.2d 417.)

A more difficult question is whether the gloss of Wilwording v. Swenson (1971), 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418, by the Court in Preiser v. Rodriguez (1973), 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439, compels the plaintiffs to seek relief via habeas corpus instead of using the Civil Rights Act (42 U.S.C. § 1983). If the plaintiffs' sole recourse were to habeas, they could not maintain their federal suit because they have not exhausted state remedies.[3]

The prisoners in *Rodriguez* brought section 1983 actions seeking restoration of good time credits that had been revoked through disciplinary procedures that they claimed violated their due process and equal protection rights. The Court, stressing that relief would result in either immediate or more speedy release from confinement, held that a writ of habeas corpus was the exclusive federal remedy because the prisoners' lawsuits were "within the core of habeas corpus in attacking the very duration of their confinement itself." (411 U.S. at 487–488.) However, the Court expressly reaffirmed its earlier holding in *Wilwording* that state prisoners challenging on constitutional grounds the conditions of confinement, rather than the fact or length of custody, could properly bring section 1983 actions, thus eliminating the habeas corpus exhaustion requirement. (411 U.S. at 498–499.)[4]

The *Clutchette* plaintiffs attack neither the fact nor the duration of their confinement. No plaintiff seeks immediate or earlier release from prison. They challenge on constitutional grounds prison procedures which can result in sanctions ranging from loss of privileges enjoyed by the general prison population to prolonged isolation from other prisoners, all of which have a significant impact on the conditions of their confinement.

2. Section 2281 provides:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

3. The defendants do not press the point on appeal as they did below, but the jurisdictionalization of this phase of abstention requires us to consider it. (28 U.S.C. §

2254(b). *See* Preiser v. Rodriguez, *supra*, 411 U.S. at 491; Fay v. Noia (1963), 372 U.S. 391, 418–480, 83 S.Ct. 822, 9 L.Ed.2d 837; *cf.* Wisconsin v. Constantineau (1971), 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed. 2d 515.)

4. The *Rodriguez* majority recognized the possibility that a prisoner might want to challenge both the conditions of his confinement and the fact or length of confinement. They noted that the latter claim "under our decision today, is cognizable only in federal habeas corpus, with its attendant requirement of exhaustion of state remedies. But, consistent with our prior decisions, that holding in no way precludes him from simultaneously litigating in federal court, under section 1983, his claim relating to the conditions of his confinement." (411 U.S. at 499 n. 14.)

The profile of their action thus appears to resemble *Wilwording*. However, a closer examination of the features of San Quentin's disciplinary procedures in the context of California's Indeterminate Sentencing Act (Cal.Penal Code §§ 1168, 3020–3035), to which these prisoners are subject, requires a reappraisal of their case under the *Rodriguez* doctrine.

The line established by *Rodriguez* between proceedings seeking earlier release from confinement and actions challenging the conditions of confinement can be applied in a good time credit system because loss of credits has a direct and specific relationship to release dates. But in California, where good time credits are nonexistent, the line is blurred to the point of inapplicability because disciplinary sanctions have no fixed relationship to the fact or length of incarceration. Under California law, the Adult Authority is empowered within statutory limits to set and to reset the terms of imprisonment of adult male offenders sentenced to prison and to serve as the parole board for such offenders. (Cal. Penal Code §§ 1168, 3020, 5077.) All disciplinary actions against a prisoner are eventually reported to the Adult Authority. The Adult Authority has unfettered discretion to decide what effect, if any, a disciplinary sanction will have on the length of an inmate's confinement.[5] The Authority can and sometimes does cancel a previously set parole date or reset the inmate's sentence to a statutory maximum on the basis of even minor disciplinary actions. (See 2 California Bd. of Corrections, Correctional System Study: Prison Task Force Report 36–37 (1971). The relationship between the imposition of a disciplinary sanction and cancellation or postponement of a prisoner's release date cannot be more precisely identified. The Authority is not obligated to state reasons for its actions (*See* Parole Board Reform in California, *supra* note 5, at 16), and, therefore, the causal connection between a record of a disciplinary offense and an adverse response by the Authority is not always evident.

■■ Because the potential effect of disciplinary sanctions on parole dates and length of sentence is so nebulous, we do not think that *Rodriguez* should be extended to compel the *Clutchette* plaintiffs to seek all of their relief through habeas corpus. Nor should *Rodriguez* be read to require plaintiffs to separate somehow those disciplinary proceedings that affect only the conditions of their confinement from those than can have an impact on their release dates, bringing civil rights actions challenging one type and habeas petitions challenging the other. Of course, we could verbally circumvent the problem by limiting the scope of relief available in this civil rights action to those disciplinary hearings that do not affect the length of incarceration time, leaving to prisoners, prison authorities, and state courts the task of deciding which proceedings are within or without our judgment. That course is unacceptable. Rather, we acknowledge that San Quentin's inmates cannot cast a habeas petition in *Rodriguez'* mold because it would be exceedingly rare, if ever, that a prisoner could aver that he would have been entitled to immediate release or release on a date certain had he not been subjected to the disciplinary procedures that he attacks on constitutional grounds. We hold that the speculative and incidental effect of prison disciplinary procedures on the duration of plaintiffs' sentences is not sufficient to bring any part of this action

---

5. No published criteria guiding the exercise of the Authority's discretion have been discovered. The discretion committed to the Authority appears to be at least as broad as that conferred on a sentencing judge. *See, e. g.*, Report of the Assembly Select Comm. on the Administration of Justice, Parole Board Reform in California 15–16 (interim study 1970) ; 3 California Bd. of Corrections, Correctional System Study: Parole Task Force Report 115 (1971).

within the "core" of habeas corpus. Therefore, it was proper for the district court to permit plaintiffs to proceed with their civil action under section 1983 without their having exhausted state remedies.[6]

## II.

■ The plaintiffs retained a residuum of constitutionally protected liberty after they were convicted and incarcerated. Serious inroads on that liberty can be made only by following due process requirements. (*Cf.* Gagnon v. Scarpelli (1973), 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656; Morrissey v. Brewer (1972), 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484.) Accordingly, our circuit and others have held that those prison disciplinary proceedings that can result in the imposition of "significant" sanctions upon prisoners must be conducted with due process safeguards. (Allen v. Nelson (9th Cir. 1973), 484 F.2d 960, aff'g (N.D.Cal.), 354 F.Supp. 505; McDonnell v. Wolff (8th Cir. 1973), 483 F.2d 1059, cert. granted (1974), 414 U.S. 1156, 94 S.Ct. 913, 39 L.Ed.2d 108; United States ex rel. Miller v. Twomey (7th Cir. 1973), 479 F.2d 701; Gray v. Creamer (3d Cir. 1972), 465 F.2d 179; Sostre v. McGinnis (2d Cir. 1971) 442 F.2d 178; *See* Palmigiano v. Baxter (1st Cir. 1973), 487 F.2d 1280.)

When the district court decided this case, it had little guidance in drawing a due process line other than the general principle, derived from Mr. Justice Frankfurter's concurring opinion in Joint Anti-Facist Refugee Comm. v. McGrath (1951), 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817, that procedural due process protections are due state prisoners subjected to disciplinary proceedings if, as a result of such proceedings, they will be "condemned to suffer grievous loss." (*Id.* at 168, *quoted in* Goldberg v. Kelly (1970), 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287, and in Morrissey v. Brewer, *supra*, 408 U.S. at 481.) In applying the "grievous loss" concept, the district court recited instances in which deprivations were serious enough to require application of due process [7] and implied that other, less significant disciplinary restrictions of a prisoner's liberty or property interests might not warrant procedural protections. Other courts have made comparable efforts at defining, at least in part, those sanctions which constitute "serious deprivations" or "grievous loss" so as to outweigh any governmental interest in summary adjudication. (*See, e. g.,* United States ex rel. Miller v. Twomey, *supra*; Sands v. Wainwright (M.D.Fla.1973), 357 F.Supp. 1062, vacated, 491 F.2d 417; Bundy v. Cannon (D.Md.1971), 328 F. Supp. 165.)

■■ The attempts thus to classify disciplinary sanctions that adversely change a prisoner's status are predicated

---

6. We agree with the district court that the traditional doctrine of abstention is inapplicable to the case at bench. Plaintiffs challenge the constitutionality of the disciplinary procedures utilized at San Quentin. There is no state law issue that can dispose of the case without the necessity of reaching the federal constitutional questions raised. (*Compare* Railroad Comm'n v. Pullman Co. (1941), 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971.) There is no question as to the meaning or scope of the disciplinary procedures challenged. Thus, there is no saving construction of the procedures that can be made to avoid their constitutional infirmity. (*See, e. g.,* Chicago v. Atchison, T. & S. F. Ry. (1958), 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.

2d 1174.) Finally, because there is no impending or ongoing state prosecution or civil action, abstention based on the notions of federalism central to Younger v. Harris (1971), 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed. 2d 669 is not appropriate.

7. The district court held that "grievous loss" included a possible increase in a prisoner's sentence by reason of referral of the disciplinary action to the Adult Authority, fine or forfeiture of accumulated earnings, isolation confinement for more than 10 days, indefinite confinement in the adjustment center or segregation, and referral to the district attorney for criminal prosecution. (328 F.Supp. at 785.)

on an erroneous notion of due process. The "schedules" developed, of course, have great relevance to an evaluation of the "weight" of the prisoner's interests affected by the imposition of disciplinary sanctions. And the relative weight of liberty or property interest has a significant impact on any determination of the formality and procedural requisites of the hearing required in particular circumstances by due process. (Board of Regents v. Roth (1972), 408 U.S. 564, 570, 92 S.Ct. 2701, 33 L.Ed.2d 548; Fuentes v. Shevin (1972), 407 U.S. 67, 90 n.21, 92 S.Ct. 1983, 32 L.Ed.2d 556.) "But, to determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake." (Board of Regents v. Roth, *supra* at 570–571, *citing* Morrissey v. Brewer, *supra*.) [8] That is, we must see if the prisoner's interest affected is within the Fourteenth Amendment's protection of liberty and property (*see id.* at 571); for any prison disciplinary proceeding that impairs a prisoner's residuum of liberty or adversely affects his property interest (and which is not de minimis) condemns a prisoner "to suffer grievous loss," as that term is now understood.

■ It is difficult to imagine any sanction that might be imposed by a prison disciplinary committee which would not constitute a further impairment of a prisoner's already restricted interest in liberty [9] (or in the case of a fine or a forfeiture of accumulated earnings, which would not constitute a deprivation of a property interest). All the sanctions considered by the district court to constitute "grievous loss" (*see* note 7 *supra*) involve an impairment of a prisoner's surviving interests in liberty and property. Any entry in a prisoner's permanent file which indicates that he has been found guilty of a violation of prison regulations, whether or not the file is forwarded immediately to the Adult Authority, has an incalculable effect on a prisoner's eligibility for parole (*see,· e. g.*, McDonnell v. Wolff, *supra*, 483 F.2d at 1064 & n.7; Hudson v. Hardy (1970), 137 U.S.App.D.C. 366, 424 F.2d 854, 856), an effect which without question impairs a prisoner's interest in "liberty." Finally, even a temporary suspension of "privileges," by restricting the prisoner's activities to a greater extent than the general prison population, constitutes an abridgment of the prisoner's limited residuum of liberty. (*See* Palmigiano v. Baxter, *supra*, 487 F.2d at 1284; *cf.* Jackson v. Godwin (5th Cir. 1968), 400 F.2d 529, 535.) Indeed, "the distinction between a 'right' and a 'privilege'—or between 'liberty' and a 'privilege' for that matter—is nowhere more meaningless than behind prison walls." (Sostre v. McGinnis, *supra*, 442 F.2d at 196 (footnote omitted)).

### III.

Under the disciplinary procedures existing at the time of commencement of this lawsuit, an accused inmate was visited by a hearing officer within 24 hours of an alleged infraction. The officer orally informed the prisoner of the charges against him. The officer could impose sanctions for minor infractions without any further investigation or hearing, but serious offenses were referred to a disciplinary committee. At the committee hearing, the complaint and, in some cases, a summary of supplemental reports were read to the inmate (but not shown to him), and he was then given an opportunity to explain his conduct. The decision of the committee was recorded and forwarded to an associate warden for approval.

8. It is clear, however, that the weight cannot be so slight that the interest may be characterized as de minimis. (Fuentes v. Shevin, *supra* at 90 n. 21.)

9. The Supreme Court, in another procedural due process context, observed generally that "the meaning of 'liberty' must be broad indeed." (Board of Regents v. Roth, *supra* at 572.)

The district court agreed with the plaintiffs' contention that these procedures did not satisfy the minimum due process standards applicable to prison disciplinary proceedings. In addition to granting declaratory relief,[10] the court enjoined defendants from conducting any further disciplinary proceedings at San Quentin so long as the procedures employed remained constitutionally infirm and ordered the defendants to submit a plan for the conduct of disciplinary proceedings consistent with the court's opinion.[11] The district court also ordered that the decisions of the disciplinary committee in the hearings of the named plaintiffs be set aside, that the plaintiffs be returned to their pre-disciplinary hearing status, and that the decisions of the disciplinary committee be expunged from the named plaintiffs' records and not be referred to the Adult Authority.

█ It is now axiomatic that the requisites of due process vary according to specific factual contexts. (*E. g.*, Morrissey v. Brewer, *supra*, 408 U.S. at 481; Goldberg v. Kelly, *supra*, 397 U.S. at 262–263.) Fashioning the due process formula for each situation requires striking an appropriate balance by identifying and assessing the relative weights of the competing individual and state interests involved. (Cafeteria & Restaurant Workers v. McElroy (1961), 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L. Ed.2d 1230; *see* Hannah v. Larche (1960), 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307.)

Every San Quentin disciplinary hearing threatens a prisoner's small store of protected liberty and potentially his property as well. The severity of the sanction that may be imposed varies and, accordingly, the kind of process due will vary, at least in detail.

The state's interests in prison disciplinary procedures administered in San Quentin are multiple and also of varying importance. They range from its interest in rehabilitation of the offender, the primary goal of a corrections system which ultimately returns almost all offenders to society,[12] through prison security and "efficient custody" to considerations of economy in using scarce public financial resources.

The least weighty of these interests in the procedural due process scale is thrift. The need for conservation of public financial resources is real.[13] However, the interest in savings that can be realized from depriving prisoners of minimum procedural safeguards designed to enhance fair fact finding is outweighed by the larger public interest in rehabilitating offenders and by the individual prisoner's interest in clinging to the remnants of his liberty. The Supreme Court has recognized the linkage between the rehabilitative goals of corrections and the conduct of correctional hearings utilizing nonsummary procedures which are fair and which appear fair to the offender. (*See, e. g.*, Morrissey v. Brewer, *supra*, 408 U.S. at 484; In re Gault (1967), 387 U.S. 1, 26, 87 S.Ct. 1428, 18 L.Ed.2d 527;

---

10. *Supra* note 1.

11. This order was stayed pending appeal, but a plan was voluntarily submitted to the district court. The plan was not made a part of the record on appeal, but it is described in Judicial Interventions in Corrections: The California Experience—An Empirical Study, 20 U.C.L.A.L.Rev. 452, 539–41 (1973).

12. It has been estimated that 99 percent of those persons sentenced to confinement will one day return to free society. (National Advisory Comm. on Crim. Justice Stds. &

Goals, Corrections 20 (1973) [hereafter cited Corrections].)

13. "[T]here are serious practical problems with introducing too many legal controls into the correctional process. Their cost in money and in the time of already overburdened defense counsel and correctional personnel would be great. Given scarce resources throughout the criminal justice system, it is obvious that some priorities must be established." (President's Comm'n on Law Enforcement & Administration of Justice, Task Force Report: Corrections 84 (1967).)

Millemann, Prison Disciplinary Hearings and Procedural Due Process: The Requirement of a Full Administrative Hearing, 31 Md.L.Rev. 27, 42–44 (1971).) It has also held that an individual's interest in an adequate hearing cannot be sacrificed to the state's interests in saving time and money: "Procedural due process is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions [or liberties] are about to be taken." (Fuentes v. Shevin, *supra*, 407 U.S. at 90 n. 22; *accord*, Goldberg v. Kelly, *supra*, 397 U.S. at 265–266.) [14] The undeniable fact that the imposition of due process minimums will increase the cost of maintaining San Quentin is not a basis for rejecting plaintiffs' due process claims.

Prison security and "efficient custody" of the inmates (Palmigiano v. Baxter, *supra*, 487 F.2d at 1285) are interests that must be accommodated. Without them, San Quentin could not be administered at all. The key word, however, is "accommodation," not "sacrifice." In emergency situations in which there is grave risk of physical harm to prison personnel or to inmates from outbreaks of individual violence or riots, immediate action can be taken. But, as the district court observed (328 F.Supp. at 782 n. 13), the state's interest in achieving security through summary procedures is adequately vindicated by permitting prison officials temporarily to isolate potentially disruptive inmates.[15] (Biagiarelli v. Sielaff (3d Cir. 1973) 483 F.2d 508; *cf*. North America Cold Storage Co. v. Chicago (1908), 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195.) Once the imminent threat of violence has passed, of course, the prison authorities have no cognizable interest in maintaining the suspected troublemakers in isolation status—or in imposing any other disciplinary sanctions—without first providing an appropriate hearing.

As we have earlier pointed out, the rehabilitative goal is improved, not impaired, by imposing procedural protections designed to thwart arbitrariness and to enhance the quality of fact finding. A prisoner who receives what he reasonably views as unfair or arbitrary treatment from prison authorities is likely to become a difficult subject for reformation or even for efficient custody. (*E. g.*, United States ex rel. Miller v. Twomey, *supra*, 479 F.2d at 715; Task Force Report: Corrections, *supra* at 83.)

 We conclude that, except in emergency situations, the inmate's interest in preserving his slight liberty and his property and the public interest in reaching the rehabilitative ends of corrections outweigh any competing interests that could be promoted by preserving summary proceedings in the conduct of San Quentin's disciplinary hearings.

---

14. *See also* Stanley v. Illinois (1972) 405 U. S. 645, 656, 92 S.Ct. 1208, 31 L.Ed.2d 551; "The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." (Footnote omitted.)

15. While emergency isolation need not be based on information which would be sufficient to warrant a finding by a disciplinary committee that the prisoner had engaged in conduct which threatened other prisoners or the prison, such action must at least be predicated on a good-faith determination that immediate action is necessary (*see* United States ex rel. Miller v. Twomey, *supra*, 479 F.2d at 717); and the isolation must be accomplished in the manner that, consistent with the maintenance of order in the prison, is least restrictive of the prisoner's rights and privileges. (*Cf.* Palmigiano v. Baxter, *supra*.)

## IV.

▆ We turn to the task of defining specifically the minimal procedural safeguards that must be accorded to San Quentin's inmates in all prison disciplinary proceedings. In doing so, we emphasize at the outset that we agree with the district court's conclusion that our judicial role is properly limited to prescribing the constitutional minimums and requiring the San Quentin administrators to produce a plan which the district court can test against the basic constitutional criteria.

*1. Notice*—The defendants concede that an essential element in any system of minimum procedural safeguards is providing the accused inmate with specific notice of the charges against him. Adequate notice has been held by our circuit to be an indispensible ingredient of minimum due process in the prison context (Allen v. Nelson, *supra*), and it has been unanimously viewed as a necessary safeguard in prison disciplinary proceedings. (*See, e. g.*, McDonnell v. Wolff, *supra*, 483 F.2d at 1062–1063; United States ex rel. Miller v. Twomey, *supra*, 479 F.2d at 716, 718; Corrections at 51.) The notice must inform the inmate of the charges against him and of the details of his alleged offense (Morrissey v. Brewer, *supra*, 408 U.S. at 489); it must be promptly delivered to him and must be received sufficiently in advance of the hearing to enable him to prepare any defense he may have. (McDonnell v. Wolff, *supra* at 1062; *see* In re Gault, *supra*, 387 U.S. at 33.) Moreover, to permit presentation of an effective defense and to facilitate the therapeutic value of a fair and impartial disciplinary hearing, the prisoner should also receive a written explanation of the procedures that will be employed at the disciplinary proceeding and a statement of his rights (and the limitation of those rights) under the hearing rules.

*2. The Right To Be Heard and To Present Witnesses*—The fundamental guaranty of due process is the opportunity to be heard. Prior to the imposition of disciplinary sanctions, an accused inmate must have an opportunity to show, if he can, that he did not violate the rule as charged or to explain that, although guilty of the charged infraction, there are mitigating circumstances. (Sostre v. McGinnis, *supra*, 442 F.2d at 198–199, 203; *see* Morrissey v. Brewer, *supra*, 408 U.S. at 489; American Correctional Assoc., Manual of Correctional Standards 409–10 (3d ed. 1966).)

He also has a right to present witnesses and documentary evidence to support his contentions. (McDonnell v. Wolff, *supra* at 1062–1063; *see* Morrissey v. Brewer, *supra* at 489; Corrections at 52.)[16] The ability to produce evidence other than his own testimony is necessary to assure that he will be heard "in a meaningful manner." (Armstrong v. Manzo (1965), 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62.) Without such a right, relevant exculpatory evidence, not within the personal knowledge of the accused but nonetheless essential to a fair and accurate fact finding determination, may not be heard at all; relevant corroborative testimony and real evidence, frequently important for the defense of a possibly unreliable prisoner, may also be presented for the same purpose. The initial decision concerning the witnesses to be called in his defense should be made by the accused. However, the disciplinary committee has the power to limit the number of witnesses called to prevent repetitiousness and to control the admission of documentary evidence to avoid irrelevant or merely cumulative evidence.

*3. The Right to Confrontation and Cross-Examination*—Confrontation and cross-examination of witnesses at a hearing help guarantee that the fact finding process is as complete and reliable as

---

16. The procedural rules utilized at the hearing should be flexible, so that it is possible to consider letters, affidavits, and other material that would not be admissible in an adversary, criminal trial. (*See* Morrissey v. Brewer, *supra* at 489.)

possible. Accordingly, "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." (Goldberg v. Kelly, *supra*, 397 U.S. at 269.) Prison disciplinary hearings, no less than parole revocation proceedings (Morrissey v. Brewer, *supra* at 489), involve factual determinations and thus must provide an opportunity for an accused inmate to demonstrate that the evidence against him is based on misperceptions or on faulty memories or that it is motivated by malice or prejudice. (McDonnell v. Wolff, *supra* at 1062–1063; Palmigiano v. Baxter, *supra*, 487 F.2d at 1290; *cf.* Greene v. McElroy (1959) 360 U.S. 474, 496–497, 79 S.Ct. 1400, 3 L.Ed.2d 1377. *But see* Sostre v. McGinnis, *supra*, 442 F.2d at 196–197.)[17]

Permitting an inmate to confront and cross-examine his accusers may threaten an erosion of traditional inmate-staff relationships. (Millemann, Prison Disciplinary Hearings and Procedural Due Process, *supra* at 53.) But this concern, based on a desire to isolate prisoners from the correctional staff and to shield the conduct of the latter from scrutiny and criticism, is premised on notions of authority that have recently been questioned. (*See, e. g.*, Corrections at 485–86.) More importantly, to the extent that accommodating this interest is inconsistent with implementation of procedural protections necessary to insure fundamental fairness in those proceedings which threaten prisoners with the deprivation of constitutionally protected

interests—such as the right to confrontation and cross-examination of adverse witnesses—the concern for administrative dislocation must yield. (*See* Fuentes v. Shevin, *supra*, 407 U.S. at 90 n. 22.)

It is also true that identification of inmates testifying against the accused prisoner, obviously a necessary aspect of confrontation and cross-examination, may lead to reprisals against those testifying. (*See generally* American Correctional Assoc., Manual of Corrections, *supra* at 410.) But this concern for the safety of inmates does not justify a wholesale denial of the right to confront and cross-examine adverse witnesses. Rather, prison authorities must attempt to provide protection for testifying inmates in a manner which creates the least interference with the right of an accused prisoner to a fair and reliable disciplinary hearing. (*See* Palmigiano v. Baxter, *supra* at 1287–1288. *See generally* Shelton v. Tucker (1960) 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231; Dean Milk Co. v. City of Madison (1951), 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329.) When an actual, legitimate fear of retributive violence exists and usual methods of protecting the testifying inmate (*e. g.*, temporary, protective segregation consented to by the inmate) are inadequate, however, a modification of the usual procedure of confrontation and cross-examination may be justified. But the exact procedures to be used under these circumstances for revealing to the accused inmate the substance of the adverse witness' testimony to permit him to rebut the evidence and for pro-

---

17. Neither the right to confront and cross-examine adverse witnesses nor the correlative right to a decision based on the evidence (*see infra*) precludes, where appropriate, the use in prison disciplinary hearings of conventional substitutes for live testimony. (*See* Gagnon v. Scarpelli, *supra*, 411 U.S. at 782–783 n. 5; *compare* note 16 *supra*.) Indeed, even in criminal trials, common law exceptions to the hearsay rule permit some evidence to be admitted without being tested by cross-examination. (*E. g.*, Dutton v. Evans (1970), 400 U.S. 74, 91 S.Ct. 210, 27 L. Ed.2d 213; California v. Green (1970), 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489.)

Similarly, the right to confront and cross-examine means .only that there must be an adequate opportunity to rebut the evidence by facing the Government's . witnesses. (Goldberg v. Kelly, *supra*, 397 U.S. at 269, 270.) Thus, there is no constitutional barrier to the use by prison authorities of written reports to support their charges against an accused inmate, provided that the inmate is given a meaningful opportunity to call the authors of the reports as witnesses and subject them to cross-examination. (Palmigiano v. Baxter, *supra* at 1290; *see* Richardson v. Perales (1971), 402 U.S. 389, 407, 91 S.Ct. 1420, 28 L.Ed.2d 842.)

viding the disciplinary committee with an opportunity to probe in camera the credibility of the witness should be, in the first instance, worked out by the prison authorities subject to the approval of the district court. (*See* Palmigiano v. Baxter, *supra* at 1290; *cf.* Gagnon v. Scarpelli, *supra*, 411 U.S. at 778, 782–783 n. 5.)

**4. A "Neutral and Detached" Hearing Body**—Basic to an accused prisoner's constitutional guarantee of an accurate and fair fact finding determination prior to imposition of sanctions is the right to be heard by an impartial disciplinary committee. (Morrissey v. Brewer, *supra* at 489; Goldberg v. Kelly, *supra* at 271; *see* Corrections, *supra* at 52.) "[P]ersonal knowledge of, and sometimes bias toward, the inmate defendant, tendency to support staff, and reaction to inmate attitude toward the [disciplinary committee]" may affect the decisions of any prison administrator or staff member sitting on a disciplinary committee. (*See* Harvard Center for Crim. Justice, Judicial Intervention in Prison Discipline, 63 J.Crim.L. 200, 210 (1972).) And it is likely that most prison officials will have some awareness of at least the more significant disciplinary problems which have arisen within the institution. Nevertheless, provided that no member of the disciplinary committee has participated or will participate in the case as an investigating or reviewing officer, or either is a witness or has personal knowledge of material facts related to the involvement of the accused inmate in the specific alleged infraction (or is otherwise personally interested in the outcome of the disciplinary proceeding), a hearing board comprised of prison officials will satisfy the due process requirement of a " 'neutral and detached' hearing body." (*See, e. g.,* Morrissey v. Brewer, *supra*

at 489; Meyers v. Alldredge (3d Cir. 1974), 492 F.2d 296 at 305–306; Landman v. Royster (E.D.Va.1971), 333 F. Supp. 621, 653.)

**5. A Decision Based on the Evidence Presented**—Use of information not presented at the hearing leaves the inmate without any means of rebutting or seeking to mitigate the evidence against him. (*See* United States v. Abilene & S. Ry. (1924), 265 U.S. 274, 289, 44 S.Ct. 565, 68 L.Ed. 1016.) For the right to confront and cross-examine adverse witnesses to be meaningful, the disciplinary committee must be required to make its fact finding determinations based solely upon the evidence presented at the hearing. (*See* Goldberg v. Kelly, *supra* at 271; Corrections, *supra* at 52.) To insure compliance with this requirement, the committee must state briefly the reasons for its decision and indicate the evidence on which it relied. (Morrissey v. Brewer, *supra* at 489; Goldberg v. Kelly, *supra* at 271.)

As we have already indicated, utilization of these procedural safeguards is necessary for any prison disciplinary proceeding to be consistent with the requirements of the due process clause of the Fourteenth Amendment, regardless of the sanction that is imposed.[18] Because the procedures challenged in this case did not meet these minimums, they are unconstitutional.

## V.

Utilization of the minimum procedural protections heretofore outlined will not be sufficient to satisfy the requirements of the due process clause in all prison disciplinary proceedings. As we have noted several times, the severity of the sanction imposed by a disciplinary committee may vary over a wide range. When the consequences of

18. Nothing we have said concerning the minimum necessary procedural protections should be construed as limiting the safeguards which prison officials may provide. Of course, to the extent that additional safeguards are utilized, they must be made available to all inmates subject to the same class

of disciplinary sanction unless there is a rational basis for differentiating between the inmates. Failure to provide such even-handed treatment, as the district court recognized (328 F.Supp. at 784), violates the equal protection clause of the Fourteenth Amendment.

disciplinary action are most serious, for example, when the inmate is subject to prolonged periods of "isolation," [19] the balance between the accused prisoner's interest in procedural protections which assure a fair hearing and the state's interest in limiting the safeguards is altered, and more "process is due." (*See* Morrissey v. Brewer, *supra* at 481. *See also* Boddie v. Connecticut (1971), 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113.) Thus, while not constitutionally required in every proceeding, in many cases prison officials must provide an accused inmate with either counsel or counsel-substitute. (*See* Corrections, *supra* at 52; Task Force Report: Corrections, *supra* at 86. *See generally* Gagnon v. Scarpelli, *supra*, 411 U.S. at 783–791.)

The Supreme Court has long recognized that "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." (Powell v. Alabama (1932), 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158.) The need for assistance to permit adequate presentation of a defense is particularly strong in the context of prison disciplinary proceedings because "penitentiaries include among their inmates a high percentage of persons who are totally or functionally illiterate, whose educational attainments are slight, and whose intelligence is limited." (Johnson v. Avery (1969), 393 U.S. 483, 487, 89 S.Ct. 747, 750, 21 L.Ed.2d 718 (footnote omitted).) Indeed, in large part because of the lack of education of parolees and probationers (most of whom are former prisoners), the Supreme Court last term held that the state's interest in informality, flexibility, and economy in parole/probation revocation hearings, in most cases, must yield to an accused probationer's need for appointed counsel whenever the probationer has a colorable claim that he has not committed the alleged infraction. (Gagnon v. Scarpelli, *supra* at 786, 790.)[20]

In the context of prison disciplinary hearings, as in the parole/probation revocation context, the question of a right to counsel involves a conflict between a prisoner's interest in avoiding unwarranted restrictions of his liberty and the state's competing interest in efficient and informal hearing procedures. The defendants have suggested no additional state interest, not present in parole revocation hearings, which, under the principles enunciated in Gagnon v. Scarpelli, justifies denial of legal assistance to an inmate who wishes to assert a factual defense or to present mitigating circumstances. However, in Johnson v. Avery, *supra*, the Supreme Court held that in some instances the assistance of fellow inmates is an acceptable substitute for the assistance of counsel or "paraprofessionals," such as law students. (393 U. S. at 490.) Thus, we cannot formulate a per se rule that whenever assistance is required in prison disciplinary proceedings, it must be provided by a qualified member of the bar. (*See* Palmigiano v. Baxter, *supra* at 1290–1292.)[21]

---

19. As described by the district court, isolation involves spending at least 23 hours per day in a cell, which may be a regular 5 feet by 9 feet concrete cell with cot, sink, and toilet or a "strip" cell with a solid door, a mat in place of the usual cot, and a hole in the floor instead of regulation plumbing. The prisoners in isolation eat meals alone and have only vocal contact with other prisoners who may be in isolation except during the brief exercise period. A special restricted diet may be imposed by the disciplinary committee. (328 F.Supp. at 775–777.)

20. The Court also held that, presumptively, a probationer has a right to appointed counsel if he has a colorable claim that, despite having committed the infraction, there are "substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present." (*Id.*)

21. In *Palmigiano* the First Circuit rejected the contention that due process requires that the state furnish counsel in all prison disciplinary hearings, noting that the rules in force in Rhode Island prisons provide for the assistance of counsel-substitute (a classification counselor or other individual specifically approved by the prison administration) if the accused inmate requests help in the presentation of his case. (487 F.2d at

■ Similarly, we cannot now specify precisely when legal assistance is required and when, if required, it must be rendered by a qualified attorney. It is no more appropriate for us than it is for the Supreme Court to write a code of procedure. (Morrissey v. Brewer, *supra* at 488.) In the first instance it is the responsibility of the prison officials—subject to approval by the district court—to evaluate in the context of the rules of the particular institution the severity of the various sanctions imposed by disciplinary committees and, once some form of "schedule" has been formulated, to decide which types of disciplinary actions are sufficiently serious to require the assistance of a qualified attorney and which require at least "counsel-substitute." In making these complex evaluations, the prison officials should consider, *inter alia*, the problems of using staff members to assist the accused inmate which may result from the inevitable conflict between loyalty and responsibility to the institution and a desire to aid one's "client" (*see* Harvard Center for Crim. Justice, *supra*, 63 J.Crim.L. at 208); the desirability of providing "out-side" counsel or counsel-substitute rather than relying on mutual inmate assistance to limit the instances of inmate "lawyers" gaining coercive power within the prison social structure (*see* In re Harrell (1970), 2 Cal.3d 675, 685, 87 Cal.Rptr. 504, 470 P.2d 640); the availability of members of the bar through publicly funded and voluntary programs operating in the vicinity of San Quentin; the proximity of the institution to law schools and the extent to which law students may be available to function as counsel-substitute; and the possibility of using paraprofessionals, trained and supervised by qualified attorneys, to serve as counsel-substitute (*see* Corrections, *supra* at 26). Accordingly, we hold that the district court properly required the defendants to submit a plan for the conduct of disciplinary hearings at San Quentin consistent with both the minimum due process requirements we have enumerated and the requirement that counsel or counsel-substitute be provided before "serious" sanctions may be imposed.

■■ Finally, we also agree with the district court's holding[7] that a prison-

---

1290.) On the other hand, the court did hold that an inmate should be permitted to bring retained counsel with him into the disciplinary hearing. (*Id.* at 1291–1292.) Counsel's role in the hearing, however, was limited to "consultation"; specifically, the court provided that counsel could not participate in cross-examination. (*Id.* at n. 27.)

It is not necessary for us now to reach the question whether there is a constitutional right to retained counsel which is broader than the due process right to appointed counsel. Consideration of this question, as well as many others relating to the proper scope and implementation of a right to counsel or counsel-substitute, should be left in the first instance to prison authorities under the supervision of the district court. (We note, for example, that the First Circuit's decision was, to a certain extent, grounded in the fact that existing prison rules permitted intermittant consultation with retained counsel outside the hearing room while the hearing was in progress. The propriety of any such rule is properly first evaluated by the responsible prison administrators.)

We do observe, however, that a serious equal protection question would be raised by any procedure which denied the assistance of counsel to indigent inmates faced with a prison disciplinary hearing but permitted such assistance for wealthy inmates. To be sure, this problem may be mitigated by the provision of counsel-substitute to indigent inmates. Moreover, it has been suggested that a case-by-case evaluation of whether counsel is required, as mandated by Gagnon v. Scarpelli, would avoid any equal protection problems with permitting retained counsel to appear. (*E. g.*, Argersinger v. Hamlin (1972), 407 U.S. 25, 63 n. 31, 92 S.Ct. 2006, 32 L.Ed.2d 530 (Powell, J., concurring).) But in Gagnon v. Scarpelli the Supreme Court considered only a probationer's *due process* right to appointed counsel, expressly leaving open the question of a due process right to be represented by retained counsel. (411 U.S. at 783 & n. 6.) By thus limiting its inquiry, the Court also left undecided the extent to which the *equal protection* clause, under Douglas v. California (1963), 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed. 2d 811 and Griffin v. Illinois (1956), 351 U. S. 12, 76 S.Ct. 585, 100 L.Ed. 891 and their progeny, provides a right to appointed counsel as a necessary concomitant of recognition of a due process right to retained counsel.

er must be afforded counsel (and not merely counsel-substitute) when he is required to appear before a prison disciplinary committee for violation of a prison rule which may also be punishable by state authorities. In Mathis v. United States (1968) 391 U.S. 1, 88 S. Ct. 1503, 20 L.Ed.2d 381, the Supreme Court held that the interrogation of an incarcerated suspect, whether or not intended to obtain evidence for a criminal prosecution and whether or not related to the offense for which the inmate questioned has been imprisoned, is "custodial interrogation" under Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. To protect his Fifth Amendment privilege against self-incrimination, an inmate subjected to such custodial interrogation is entitled to be advised of his right to remain silent and is entitled to have an attorney present—if he wishes—before further interrogation is constitutionally permissible. (391 U.S. at 3–4.) It follows from *Mathis* that if the disciplinary committee directed questions at the accused inmate, he would be subject to "custodial interrogation" and would have a Fifth Amendment right to remain silent and a right to be represented by counsel (retained or appointed) while subject to such questioning. Failure to recognize these rights would render the disciplinary hearing constitutionally invalid.[22]

Under the disciplinary procedures utilized in San Quentin at the commencement of this lawsuit, however, inmates were not asked questions by the disciplinary committee. Instead, a prisoner was given standard *Miranda* warnings (but told that the right to counsel attached only when he was questioned by the district attorney) and then was given opportunity to explain his conduct. We agree with the district court's conclusion that the "opportunity to explain" was in actuality a subtle form of interrogation. In effect, the disciplinary committee presented the evidence against the prisoner and then said to him, "And what do you have to say about that?" The interrogative nature of the hearing, however, does not depend on an absence of other procedural protections, as the district court apparently concluded. (328 F.Supp. at 779 & n. 7.) A disciplinary hearing is inherently inquisitive. It is designed to induce revelation of all the facts, including the accused inmate's version of them. The prison disciplinary hearing forces the prisoner into a situation of "interrogative custody," and the prison authorities must safeguard the inmate's privilege against self-incrimination. Adequate protection is provided either by postponing disciplinary action until after criminal proceedings have been completed by the courts or by providing the accused inmate with an attorney and advising him of his right to silence pursuant to the requirements of Miranda v. Arizona, *supra.*[23]

---

22. The Supreme Court has consistently invalidated impermissibly coercive governmental actions which have as their goal compulsion of self-incriminatory statements and has attempted to remedy the coercion by returning the injured parties to the *status quo ante.* (*E. g.*, Lefkowitz v. Turley (1973) 414 U.S. 70, 79–84, 94 S.Ct. 316, 38 L.Ed.2d 274; Gardner v. Broderick (1968), 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082.) The *Miranda* Court recognized that custodial interrogation was inherently coercive. (384 U.S. at 445–458.) Without the procedural safeguards it formulated (or equally effective legislative procedures for apprising accused persons of their right to silence (*id.* at 467)), custodial interrogation was held to be impermissibly coercive. (*Id.* at 467–479.) Accordingly, failure to satisfy the *Miranda* procedural guarantees when required in a prison disciplinary hearing would render the hearing itself impermissibly coercive; and, consistent with *Turley* and *Gardner*, the accused inmate may seek judicial relief from any consequences of the hearing.

23. In holding that an accused inmate is entitled to "use immunity" for statements he might make within the prison disciplinary hearing, the First Circuit appeared to assume that a prisoner has no right to remain silent in the disciplinary hearing without his silence being used against him. (Palmigiano v. Baxter, *supra* at 1289–1290.) We agree,

The decree and orders of the district court are modified only to the extent necessary to comply with our opinion; in all other respects the decree and orders of the district court are affirmed. The cause is remanded to the district court for further proceedings consistent with the views herein expressed.

Petition for rehearing has been granted in the light of Wolff v. McDonnell (1974), —— U.S. ——, 94 S.Ct. 2963, 41 L.Ed.2d ——. A new opinion will be later published.

KILKENNY, Circuit Judge (concurring and dissenting):

I agree with the majority's treatment of the three-judge issue, but I do not condone the strictures placed by the majority on the overall impact of Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), in connection with the exhaustion of state remedies.

Utilizing Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), in support of jurisdiction, the majority incorrectly says: ". . . Plaintiffs attack neither the fact nor the duration of their confinement." The inaccuracy of this statement is demonstrated by the following quotation from Clutchette's amended complaint:

"In addition to the above punishments imposed upon plaintiff CLUTCHETTE by the disciplinary committee, the action of the disciplinary committee will be referred by defendants to the California Adult Authority, which under California law is charged with the responsibility of setting plaintiff's sentence and term of imprisonment and determining whether plaintiff should be released on parole. Resolution No. 216 (6/5/64) of the Adult Authority requires that a report of all disciplinary actions involving an inmate be presented to the Adult Authority at the time when the Adult Authority considers the fixing of the sentence and parole date. On information and belief, the Adult Authority takes into consideration and

as of course we must, that if a prisoner is compelled to answer questions or to explain his conduct under either prison regulations or because he has been advised that his silence will be used against him in the disciplinary hearing, his answers are inadmissible against him in a later criminal prosecution: a prisoner may rightfully refuse to give testimony which might tend to show that he had committed a crime "unless and until he is protected at least against the use of his compelled answers (and evidence derived therefrom) in any subsequent criminal case in which he is a defendant." (E. g., Lefkowitz v. Turley, supra at 78; Kastigar v. United States (1972), 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212; Garrity v. New Jersey (1967), 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562.)

However, as we have already indicated, there is, absent a grant of use immunity, a right to remain silent at a disciplinary hearing without that silence being used against the inmate, based on Miranda and Mathis. Nevertheless, Miranda itself recognized that this right (as well as the right to counsel) may be voluntarily waived by the suspect, provided that he first has been clearly informed of his rights. (384 U.S. at 475.) Similarly, the accused inmate can waive his right to remain silent. To be sure, the inmate faces a dilemma. If he remains silent, he yields a valuable defense and risks seri-

ous punishment; if he decides to speak in his own defense at the disciplinary hearing, however, he risks self-incrimination in a subsequent criminal prosecution. But the necessity of making this difficult choice does not render the decision to speak "coerced" nor does it require a grant of use immunity. It has long been held that when a witness voluntarily testifies in a civil or criminal proceeding, he has waived any Fifth Amendment right to object to subsequent use of such testimony. (4 J. Wigmore, Evidence § 1066, at 82 (Chadbourn rev. 1972); 8 id. § 2276 (McNaughton rev. 1961); see Simmons v. United States (1968), 390 U.S. 377, 394 n. 23, 88 S.Ct. 967, 19 L.Ed.2d 1247. See also Brown v. United States (1958), 356 U. S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589.)

In essence then, the prison authorities have a choice: either they can guarantee a right to silence without the silence adversely affecting the accused inmate and provide Miranda safeguards, thus preventing the disciplinary hearing from being impermissibly coercive, in which case there is no right to use immunity if the prisoner decides to speak at the hearing; or they can require that the inmate speak in his own defense (see Gardner v. Broderick, supra, 392 U.S. at 278–279 (dictum); Palmigiano v. Baxter, supra), in which case use immunity follows as a necessary consequence of the compelled disclosures. (Garrity v. New Jersey, supra.)

views unfavorably disciplinary records of the kind involved in plaintiff's case. Therefore, the action of the disciplinary committee in finding plaintiff guilty of misconduct *and imposing serious punishment may seriously prolong plaintiff's actual term of imprisonment.*" [Emphasis supplied]

Paragraph (c) of the prayer requests the following relief:

"(c) A preliminary and permanent injunction setting aside the disciplinary actions taken against plaintiff CLUTCHETTE on November 20, 1970, and against plaintiff JACKSON on November 25, 1970, *expunging such actions from defendants' records, restraining defendants from reporting such actions to the Adult Authority and reinstating plaintiffs' normal prison privileges;*". [Emphasis supplied]

Jackson makes precisely the same charges.

That the duration of appellees' imprisonment is at stake is made clear by the findings of the trial judge from which I quote:

"Needless to say, an inmate's prison behavior is a key factor in the Adult Authority's decision making process. Currently, Resolution No. 216 (6/5/64) of the Adult Authority requires that a report of all disciplinary actions be presented to the Adult Authority at the time it considers the fixing of sentence and parole date. While a disciplinary proceeding cannot result in loss of good-time credits—since there are no good-time credits in California due to the internal inconsistency of earning credits against an indeterminate sentence—*it is obvious that disciplinary action taken against a prisoner and reported to the Adult Authority can and does have an adverse effect on the length of his sentence, parallel to the loss of good-time credits in other jurisdictions.*

"If the disciplinary committee finds an inmate guilty of a disciplinary offense occurring after the Adult Authority has set his sentence and parole date, the offense must be reported to the Adult Authority for immediate action. *A single disciplinary offense is sufficient cause for the Adult Authority to rescind the parole release order and reset the prisoner's sentence at the statutory maximum,* and the disciplinary committee is authorized to recommend that the Adult Authority rescind the parole date." 328 F.Supp. 767, 777 (N.D.Cal.1971). [Emphasis supplied]

Following through on these findings of fact, the lower court, as part and parcel of its judgment, declared:

"4. The decisions of the disciplinary committee in the disciplinary hearings of the named plaintiffs, Clutchette and Jackson, are set aside, and, said plaintiffs shall be restored to the status of confinement they enjoyed prior to the institution of such proceedings, *and such decisions shall be expunged from all their records, and shall not be referred to the Adult Authority;*". 328 F.Supp. 784 (N.D. Cal.1971). [Emphasis supplied]

In light of appellees' complaint, and the court's findings, I would hold that *Rodriguez, supra,* is controlling and that appellees should be required to exhaust their state remedies before resorting to other relief. I speak to the merits only under the compulsion of the majority holding that appellees need not exhaust their state remedies.

### ON THE MERITS

At the outset, we must recognize the fundamental difference between a normal society and a society within prison walls. The absolute necessity of strict security and discipline, with its troublesome, but unavoidable, restraint on an inmate's freedom to act, is a controlling principle of safe and efficient prison administration. The inherent characteristics of a prison community are such that prison officers, such as here, must make prompt decisions as problems confront them, and this governmental interest in maintaining disciplined order in the prison far outweighs the individual interest in perfect justice. Here, the offi-

cers were faced with two defiant prisoners who refused to obey orders. The confrontation turned the prison visiting room into a bloody battleground, in which Clutchette assaulted one of the officers with the leg of a broken chair and, in turn, was placed in handcuffs. In these circumstances, due process is highly flexible and calls for only those procedural protections which the situation suggests.

I will respond to the contentions of the majority in the order in which they are set forth in the opinion.

## NOTICE

Before us are the written institutional guidelines and procedures to be followed by the officers of the institution in disciplinary matters. First, there is the detailed code of rules of the Director of Corrections and of the Wardens and Superintendents of the State of California Prison System. Within this Code are the specific rules guiding the officers of San Quentin Prison in the administration of inmate discipline. Second, there is the San Quentin Prison Institution Plan for the Administration of Inmate Discipline. This Plan is divided into four specific chapters consisting of: (I) general introduction, (II) administrative policies and responsibilities, (III) operating procedures with reference to inmate discipline, and (IV) disciplinary unit operations. Section ID-II-OI provides that: ". . . when the conduct of an inmate results in a serious violation of the rules, or of the law, . . ." it is the duty of the employee having knowledge of the violation to immediately report the facts in writing on a Form CDC–115.[1] This Form, "Report of Vio-

---

I.

## DEPARTMENT OF CORRECTIONS

### REPORT OF VIOLATION OF INSTITUTION RULES·

SAN QUENTIN STATE PRISON
(Institution)

To the Warden-Superintendent

I, J.V. HAHN, Visiting Rm. Of, hereby charge ___CLUTCHETTE___ B-4804
(Name) (Number)

with violation of institution rules and regulations ___INMATE BEHAVIOR: OBEYING ORDERS
(Title)

D1201-D1202 on or about ___Saturday 11-14-70 1:35 p.m. the circumstances of which
(Number) (Day) (Date) (Time)

are as follows: REFUSING TO OBEY A DIRECT ORDER BY AN OFFICER, MIS-CONDUCT IN THE PRESENCE OF VISITOR, CONDUCT THAT COULD LEAD TO VIOLENCE.

"SEE ATTACHED SUPPLEMENTAL REPORTS"

Refer to A.C.DCM
cell status pending DCM

Custody ___

J.V. HAHN, Visiting Room Officer
(Reporting Employee)

Post #65

lation of Institution Rules", sets forth the facts which form the basis for the purported violations. The Form, after completion, is forwarded to the writer's (officer who submitted the Form) "area supervisor" for screening. If the supervising officer concludes that the charge is legitimate, and the report is properly prepared, the supervisor will indicate approval by initialing the Form, and will then forward it to the Custody Officer for scheduling on the appropriate Hearing Court Docket.

To be complete, the Form must set forth the nature of the violation, when it occurred, where it occurred, and who committed the violation. The attached supplemental reports mentioned on the face of the Form were introduced in evidence as appellant's Exhibit One. These reports were prepared by correctional officers who either participated in the struggle, or witnessed the incident in the visiting room.

The Form is not given to the inmate, but the charges set forth therein are read to him within twenty-four hours of the infraction, and again at the hearing. In the instant case, both the Form, and portions of the supplemental reports attached thereto, were read to Clutchette

---

### DEPARTMENT OF CORRECTIONS

*Doc 191*

# REPORT OF VIOLATION OF INSTITUTION RULES

SAN QUENTIN PRISON
(INSTITUTION)

To the Warden/~~Superintendent~~X

I, K.F. FONCANNON, Sergeant , hereby charge _____ CLUTCHETTE _____ B-4804 _____
 (NAME) (NUMBER)
with violation of institution rules and regulations _____ INMATE BEHAVIOR _____
 (TITLE)
 A.M.
 P.M.
D-1201 _____ on or about SATURDAY 14 NOVEMBER 1970 at 2:00 PM, the circumstances of which
(NUMBER) (DAY) (DATE) (TIME)
are as follows: (ASSAULTING AN OFFICER)

(SEE ATTACHED SUPPLEMENTAL REPORT)

*Refer to A.C.DC.M*
*cell status pending DCM*

*K.F. Foncannon*
KF FONCANNON (REPORTING EMPLOYEE) Sergeant
Post #22, Main Yard Sergeant

*Custody May*
*R A Nelson P.C. LT 11-19-70*

at the hearing. Additionally, when an inmate commits an infraction sufficient to warrant an appearance before the disciplinary committee, a CDC Form 263,[2] or "Notice of Complaint", is prepared. This Notice must contain the inmate's name and number, the probable date of appearance before the disciplinary committee, and the charge. The Notice is read to the inmate prior to the hearing, and in accordance with prison rules must be completed in duplicate with the

2.

## NOTICE OF COMPLAINT

Date ................................................................., 19............

.................................................................................................
(Name) (Number)

1. You are hereby notified that a written complaint has been filed against you. A copy of the complaint is attached hereto or the charge(s) against you listed hereon.

2. A hearing on the charge(s) will be held at ..................................................................................... .............................................. on the ........... day of ........................................................... 19........., or as soon thereafter as the matter can be heard.

3. At that time, the Adult Authority or its representatives committee of prison officials, as provided by the California Penal Code and Adult Authority Resolutions, will conduct a hearing to determine your guilt or innocence, and when applicable, a determination will be made regarding:

 a. Revocation of parole (Sec. 3060 P.C.)

 b. Forfeiture of credits (Sec. 2923 P.C.)

 c. Refixing of term (Sec. 3020 P.C.)

CHARGE(S)

CALIFORNIA ADULT AUTHORITY
Classification and Parole Representative

I hereby acknowledge receipt of a copy of the complaint specified above or attached hereto and a copy of the foregoing notice of hearing.

Dated .........................................., 19............ ..................................................................................
 (Name) (Number)

NOTICE TO PAROLE VIOLATORS: By virtue of Adult Authority Resolutions when parolees' are suspended, terms are refixed at the maximum, and on commitments received prior to January 1, 1948, credits for the semi-annual period are disallowed.

CDC-263

No. C 70-2497
Exhibit No. 2
Filed DEC 4 - 1970
James P. Welsh, Clerk
By _____
Deputy Clerk

original going to the inmate for his signature. In the instant case, the Notice introduced in evidence was in blank. However, appellees' only witness testified that the Notice contained the violations in language similar to that used on the Form CDC–115. It is noteworthy that appellees' sole witness testified that the Notice was tendered to Clutchette for his signature, but Clutchette refused to sign it.

Even conceding, which I do not, that the rights of an inmate in prison are precisely the same as the rights of a parolee at liberty, as those rights are enunciated in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), I would hold that the disciplinary notice requirements of the San Quentin Prison, as previously outlined, are constitutionally adequate and that we should not force upon the warden a set of guidelines which could seriously impair the effectiveness which inheres in prompt prison disciplinary proceedings.

## RIGHT TO BE HEARD AND TO PRESENT WITNESSES

I am unable to find anything in the regulations which would prevent inmates from testifying, or from calling witnesses in their own behalf. True enough, a prison official testified that an inmate is not allowed to call witnesses. If this be the fact, the procedure should be changed. To this extent, I concur in the opinion of the majority. However, I do not believe that an inmate is entitled to call, for the purpose of confrontation and cross-examination, the persons who filed charges against him. This subject will be discussed under the next heading.

## RIGHT TO CONFRONTATION AND CROSS-EXAMINATION

One of the most controversial questions in the field of prisoners' rights is whether inmates should be permitted to confront and cross-examine the person making the charge against them. A good many courts and commentators, in weighing the interest of the inmate against that of prison administration, have concluded that the prison's interest in security must yield to the inmate's right to confront and question his accusers. Cases along this line are cited in the majority opinion. In general, I would say that the state's interest in prompt, decisive action decidedly outweighs the individual inmate's interest in cross-examining the superintendent, the guard, or the fellow prisoner who might have made the charge against him. This is particularly true where, under the regulations, there is no prohibition against the inmate calling witnesses and testifying in his own behalf. Such a confrontation would inevitably go beyond the usual consequences of a cross-examination in court. The imposition of the right to confrontation would lead to a chaotic procedure where in every instance of discipline the inmate would insist on confronting his accuser. It is only in rare cases that even a parolee is entitled to the additional procedural safeguard of the right to confront witnesses and in those special instances the burden is on the parolee to allege facts demonstrating that the failure to provide this procedural safeguard is, under the circumstances of his case, an essential element of due process. Dennis v. California Adult Authority, 456 F.2d 1240 (CA9 1972).

If it is only in exceptional cases that a parolee is entitled to confront his accusers, then, beyond question, it is only in very exceptional cases that an inmate in a prison may be accorded such a right. I would not grant a wholesale right of cross-examination and confrontation to inmates, but would limit the right to those cases where the loss to the inmate might be "severe" or "grievous". Here, I would say that the charges against appellees were "'grievous" and that under these circumstances, they should have been allowed to confront their accusers. Generally, Meyers v. Alldredge, Warden, 492 F.2d 296 (CA3 1974), is in support.

of these views. Moreover, except in the most unusual cases, the prison authorities should not be compelled to identify other prison inmates who supplied information as to the conduct of the accused. Such a disclosure, in all probability, would lead to reprisals against those assisting in prison discipline and in such cases the safety of the cooperating inmates far outweighs any alleged right of the accused to confrontation and cross-examination. This flow of valuable information would cease if the accused had the rights suggested by the majority. The evidence contained in the written statements and considered by the committee should be likened to the statements in a pre-sentence report considered by the sentencing judge, *Cf.* United States v. Weston, 448 F.2d 626, 633 (CA9 1971), cert. denied, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972). The majority would give an inmate greater rights than those of a defendant prior to sentencing.

## A "NEUTRAL AND DETACHED" HEARING BODY

To the extent that an inmate, prior to the imposition of sanctions, has a right to be heard by an impartial disciplinary committee, I concur with the majority. However, I am not convinced that a member of the disciplinary committee should be barred from sitting merely because he participated in the case in an investigatory capacity or because he might have some knowledge of the material facts relating to the inmate's involvement. The promulgation and enforcement of such a rule would paralyze the execution of prison disciplinary procedures. It is probably seldom, if at all, that the facts in a major or "severe" prison disturbance are not broadcast, by underground or otherwise, to the entire prison population. Consequently, most, if not all, of the prison officials would have some knowledge of the affair. The enforcement of such a rule would be akin to preventing a judge from testifying in a case in which he was pre-

siding. Needless to say, there is no such rule. Of course, a member of the disciplinary committee with knowledge of the facts outside of the record as presented, should not take those facts into consideration in the decisional process. Here, the record shows that a member of the disciplinary board arrived on the scene of the incident a short time after it occurred. Thereafter, he observed the appellees being restrained with handcuffs. There is nothing whatsoever in his report that would indicate he in any way participated in the investigation or had any knowledge of the incident other than to say that Clutchette allowed examination of the cut on his head and refused medical aid. Nothing in the record even suggests that this member of the committee had any inside knowledge of the occurrence. Therefore, I would hold that the disciplinary committee was constitutionally constituted.

## A DECISION BASED ON THE EVIDENCE PRESENTED

I concur in the majority's view that the decision of a disciplinary committee must be based on the evidence presented at the hearing and that it should state briefly the reasons for its decision. However, I would not require the committee to recite the evidence on which it relied in reaching its decision.

## RIGHT TO COUNSEL

I have already expressed myself on this subject in my dissent in Palmigiano v. Baxter, 487 F.2d 1280 (CA1 1973), and I find nothing in the observations of the majority to change my views. The presence of counsel at hearings in prison disciplinary proceedings would create havoc. Counsel's presence would be meaningless unless they could participate in the proceedings. If, as I said in *Palmigiano*, a defendant under indictment for the major crime of bank robbery, is not entitled to the presence of counsel during a display of photographs arranged for the specific purpose of

identification, I cannot bring myself to believe that a prison inmate, with very limited rights, is constitutionally entitled to counsel at a disciplinary hearing, even though the hearing might result in "severe" or "grievous" loss to the inmate. Always to be kept in mind is the fact that a prison disciplinary proceeding is not to be equated with a criminal trial.

An inmate is charged with a violation of a disciplinary rule, not with a criminal offense. The charge might incidentally involve a crime under state or federal law, but a finding of guilt in the disciplinary action would in no way affect the inmate's rights in a criminal action growing out of the controversy. The majority's reliance on Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), is completely misplaced. The distinction between our case and *Mathis* is readily apparent. There, although the defendant was in custody, he was only a suspect and was entitled to his full constitutional rights. Here, as everyone concedes, the inmates' constitutional rights were severely narrowed upon their conviction and imprisonment. By strong implication United States ex rel. Miller v. Twomey, 479 F. 2d 701, 715–716 (CA7 1973), supports my view. Meyers v. Alldredge, *supra*, is directly in point and holds that inmates are not entitled to counsel in prison disciplinary proceedings. In *Meyers*, the court said:

> "The need for legal skills is less acute at a prison hearing, where there are no formal evidentiary rules, and the interjection of counsel in prison disciplinary hearings would severely conflict with and undermine the prison administration's interest in summary disposition of disciplinary matters." At 309.

What was said in *Mathis* in connection with the right to counsel has no application to our factual background.

The majority proposal that disciplinary proceedings be postponed until after criminal actions have been completed in the courts would be impossible of fulfillment in the atmosphere of a prison where maximum security is required. The postponement suggestion is even more unique than the "use immunity" proposal outlined in Palmigiano v. Baxter, *supra*. The only alternative to postponement offered by the majority is that the accused inmate be provided with an attorney under *Miranda* guidelines. I cannot accept either proposal.

The trial in the lower court was at best a bobtailed affair. There never was a trial on the merits unless it can be said that the hearing on the application for a preliminary injunction took the place of a full-fledged trial. As the record now stands, it is next to impossible to decide the precise procedures followed in this case. Appellees called the only witness, an official in the San Quentin system. A trial on the merits in the state court would certainly clear the atmosphere and give the courts a solid ground on which to base a ruling. Despite appellees' argument that appellants waived their right to a trial on the merits, as provided for in Rule 65(a)(2), F.R.Civ.P., I believe such a trial would give a court a much clearer picture of what occurs in disciplinary proceedings in San Quentin.

## CONCLUSION

Since appellees made no attempt to exhaust their state remedies, I would reverse and give the state courts an opportunity to judicially examine, in a full blown trial, the constitutionality of the prison rules and of the procedures utilized to enforce them.