Michael C. BARTHOLOMEW, Scott M. Balwin, Earl W. Branch, Louis Chavarria, Stephen C. Chochrek, Robert Danielson, Dana B. Robinson, Ernest Leroy Smith, Plaintiffs, on behalf of themselves and all others similarly situated,

v.

Amos E. REED, Administrator, Oregon Corrections Division, Hoyt C. Cupp, Superintendent, Oregon State Penitentiary, George E. Sullivan, Superintendent, Oregon State Correctional Institute, T. G. Toombs, Superintendent, Oregon Women's Correctional Center, Defendants.

Civ. No. 73–438.

United States District Court,
D. Oregon.

Opinion April 19, 1979.

On Motion for Preliminary Injunction
July 11, 1979.

·Gene B. Mechanic, Prisoners' Legal Services of Oregon, Salem, Ore., for plaintiffs.

Al J. Laue, Justice Dept., Salem, Ore., for defendants.

## OPINION

JAMES M. BURNS, District Judge:

This is a class action brought on behalf of inmates of Oregon State Correctional Institution (OSCI), Oregon State Penitentiary (OSP), and Oregon Women's Correctional Center (OWCC), challenging various aspects of the rules of those institutions. The inmates seek declaratory and injunctive relief.

Challenges are made to portions of three groups of regulations:

1) Procedures for Disciplinary Action;
2) Rules of Prohibited Conduct; and
3) Procedures for Administrative Segregation and/or Involuntary Institutional Transfer of Inmates.

In assessing the issues presented by the parties' cross motions for summary judgment, I am mindful of the fact that prisoners do not leave their constitutional rights at the prison door. At the same time, it is evident that the particular needs and circumstances of the prison environment may legitimately result in the loss of many of the rights and privileges enjoyed by citizens in a free society. To reconcile these competing and often conflicting concerns is difficult indeed. My endeavor must be to reach a decision which does not unduly ˛ hamper safe and effective prison administration, yet adequately safeguards plaintiffs' rights.

## I. PROCEDURES FOR DISCIPLINARY ACTION:

The Procedures for Disciplinary Action set forth the procedures to be followed in disciplining an inmate accused of violating one of the Rules of Prohibited Conduct. In brief, they provide for written notice to the inmate of the charges against him,[1] an evidentiary hearing before a disciplinary committee and the imposition of sanctions. The committee makes a written "Finding of Fact, Conclusion and Recommendation" which is then reviewed by the institution superintendent. Plaintiffs allege that these procedural rules violate due process in various ways.

The seminal case is *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In *Wolff*, the Supreme Court held that the Constitution contained no guarantee of "good time" for satisfactory behavior in prison. However, where state law creates a right to good time which may be forfeited only for misbehavior, the pris-

---

1. I use "him" for convenience, and because the numbers of men greatly exceeds that of women inmates.

oner's interest in retaining his good time rises to the level of a "liberty" protected by due process clause of the Fourteenth Amendment. Inmates are thus entitled to "those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that state-created right is not arbitrarily abrogated." 418 U.S. at 557, 94 S.Ct. at 2975.[2] The Court also held that such procedural safeguards were required where "solitary confinement" might be imposed. Section V(2)(c)(6), (7) and (8) of the disciplinary procedures at issue here include placement in isolation or segregation and a recommendation for a reduction in good time as possible sanctions.

The *Wolff* Court further stated:

> Of course . . . the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. . . . Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. . . In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. 418 U.S. at 556, 94 S.Ct. at 2975.

Considering these factors, the Court then delineated the specific procedural requirements which must be followed in prison disciplinary proceedings. The specific holdings of *Wolff* will be discussed in conjunction with the consideration of the particular issues raised by plaintiffs which follows.

### A. COMPOSITION OF THE HEARING PANEL.

■ The procedural rules, II(2), provide that:

A disciplinary committee shall have no less than three and no more than five members. Representatives of the program services or rehabilitation program shall be included in the membership; no less than one on three-member committees and no less than two on five-member committees. The superintendent shall appoint one of the members as chairman.

For the reasons which follow I find this rule is deficient in that it fails to require that the hearing panel be impartial.

■ In *Clutchette v. Procunier*, 497 F.2d 809 (9th Cir. 1974), the Ninth Circuit Court of Appeals held that a neutral and detached hearing body was required in prison disciplinary proceedings. This requirement could be satisfied by a disciplinary committee composed of prison officials if no member of the disciplinary committee has participated or will participate in the case as an investigating or reviewing officer, or is a witness or has personal knowledge of material facts. On rehearing for reconsideration in light of *Wolff*, the Ninth Circuit, without discussion of this issue, modified its opinion in some respects, but expressly reaffirmed it in all other respects. 510 F.2d 613 (9th Cir. 1975). *Clutchette* was reversed by the Supreme Court *sub nom Baxter v. Palmigiano and Enomoto v. Clutchette*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). However, because appellees did not raise it on appeal, the Supreme Court specifically did not reach the issue of the composition of the hearing panel, 425 U.S. at 324, n. 6, 96 S.Ct. 1551.

Unless it is in conflict with Supreme Court holdings, *Clutchette* would appear to be controlling in this circuit. (See latest case.) *Wolff* held that the disciplinary committee involved there was "sufficiently im-

---

**2.** ORS 421.120(1) provides: "Each inmate confined in execution of the judgment of sentence upon any conviction in the penal or correctional institution, for any term other than life, and whose record of conduct shows that he faithfully has *observed the rules of the institution, and where industry and general reformation are certified to the Governor* by the superintendent of the penal or correctional institution,

*shall be entitled*, upon the order of the Governor, to a deduction from the term of his sentence to be computed as follows: . . ." (Emphasis supplied.)

Defendants do not contend that the *Wolff* requirements are inapplicable to disciplinary proceedings. Their contention is that the current regulations meet those standards.

partial" to satisfy the due process clause. This seems a recognition that at least some impartiality is required. The committee before the Court in *Wolff* was made up of the Associate Warden Custody, the Correctional Industries Superintendent, and the Reception Center Director. Thus, it consisted of supervisory personnel in the prison administration who would, in general, be less likely than line personnel to have direct knowledge of the incident involved. Here, the rule, in terms, does not exclude the possibility of the presence of "partial" members.

## B. RIGHT TO CALL WITNESSES.

Rule IV(5)(b) provides that:

An inmate has a limited right to call witnesses to testify before the disciplinary committee.

(1) Another inmate may not be called as a witness since allowing such testimony is unduly hazardous to institutional safety and correctional goals.

(2) Staff members who are working in the *institution* or whose duties take them within the institution may not be called as witnesses since such testimony is unduly hazardous to institutional safety and correctional goals.

(3) Other persons may not be called as witnesses if their testifying is unduly hazardous to the witness, institutional safety and/or correctional goals or the testimony to be offered is not relevant and/or reasonably available. (Emphasis supplied.)

■ *Wolff* held that an inmate should be allowed to call witnesses and present documentary evidence when "permitting him to do so [would] not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979. *Wolff* thus did not impose a blanket prohibition on certain species of testimony or evidence, but rather envisioned a case by case determination of undue hazard. Thus the Supreme Court noted that: "Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity or the hazards presented in individual cases." *Id.* (Emphasis added.)

The testimony of inmates or staff members will, in most cases, be the most relevant evidence a prisoner could offer in his defense. The right to present evidence is ordinarily basic to a fair hearing, *id.*, and the substantial inroads made on that right by this rule as worded are not outweighed at all times and under every circumstance by considerations of administrative convenience. Where, in a specific case, the testimony of a specific witness would present undue hazards, that testimony may lawfully be excluded, as *Wolff* specifies.

## C. RIGHT TO PRESENT DOCUMENTARY EVIDENCE.

■ As noted above, *Wolff* held that prisoners ordinarily have the right to present documentary evidence on their behalf. This right was afforded in previous versions of the rules, but any mention of it has been eliminated in the most recent version. An opportunity to present documentary evidence, except in exceptional circumstances, is constitutionally required. Because prisoners may be unaware of this right if it is not set forth in the regulations, specific reference should be made therein. I note also that in *Bonney v. Oregon State Penitentiary*, 270 Or. 79, 526 P.2d 1020 (1974), the Oregon Supreme Court, relying on *Wolff*, recognized that both the Oregon and United States constitutions require the admission of documentary evidence and that such evidence would generally present no problem of undue hazard.

## D. UNIDENTIFIED INFORMANT TESTIMONY.

Regulation IV(5)(e) provides that:

Information derived from unidentified informants may be considered by the disciplinary committee.

(1) The disciplinary committee must find good cause to believe that an individual would be in jeopardy or at unusual risk of harm if his identity and statement were revealed.

(2) The record must contain information from which the disciplinary committee can reasonably conclude that the in-

formant was credible and his statement reliable.

(3) Since experience shows that revealing the identity of the informant or his exact statement in the disciplinary process creates a substantial risk that the informant's identity will be discovered and the informant placed in jeopardy, the disciplinary committee need not know the identity of the informant nor the exact statement to satisfy these standards, but may rely upon conclusory representations and a summary of evidence submitted by the recipient of the confidential information who must be identified.

■ While unidentified informant testimony may be necessary in the prison setting, subpart (3) of this regulation provides insufficient restrictions upon use of such testimony. It is clear that *Wolff* contemplates a decision based on factual evidence presented to the disciplinary committee. *Wolff* requires a " 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action."[3]

■ Part of the committee's task as a factfinder is to evaluate credibility and reliability of the evidence presented. This process is severely hampered if they are normally permitted (or required) to rely upon mere "conclusory representations." Because *Wolff* held that an inmate need not be given the opportunity to confront and cross examine adverse witnesses, it is especially important that the factfinders be presented with complete information on which to base their assessment of the informant's testimony. In order to properly consider the weight to be given to the testimony of informants, normally their identity or the exact nature of the information they have furnished, or both, ought to be revealed to the disciplinary committee. This does not, of course, mean that the informant's identity or the precise nature of his information must be revealed to the subject

of the disciplinary proceeding. Adequate protection for the informant is provided by the Supreme Court's holding that: "[W]hen personal or institutional safety is so implicated . . . the statement [or evidence relied on] may properly exclude certain items of evidence, but in that event the statement should indicate the fact of the omission."

## E. TIME FOR FILING MISCONDUCT REPORT.

Procedural regulation III(2)(a) states that:

The staff member shall file a misconduct report within a reasonable time, but not more than one week, after sufficient evidence is gathered, discovered and/or observed to support a charge of violation of institutional rules. Determination of the sufficiency of evidence is a matter of judgment for the staff member submitting the report.

■ Plaintiff argues that this regulation may force an inmate to defend himself against stale charges because filing of a report and the resulting hearing may be delayed until after sufficient evidence to support disciplinary action is gathered. The recent Supreme Court cases are silent on this point. *Wolff* points out that due process is a flexible concept. It should not be so construed as to hamstring prison officials in the performance of their legitimate prison disciplinary functions. Bearing this in mind, I am satisfied that adequate protection against stale charges is provided by the requirement that a report be filed within one week after the evidence is "gathered, discovered or observed."

## F. INCREASE IN SANCTION BY SUPERINTENDENT.

Rule VI(1) provides that:

facts be excluded from consideration, inasmuch as they may provide valuable information with respect to the incident in question and may assist prison officials in tailoring penalties to enhance correctional goals." 425 U.S. 322, n.5, 96 S.Ct. 1560, n.5. (Emphasis supplied.)

---

**3.** In *Baxter, supra,* the Supreme Court stated that: "Due to the peculiar environment of the prison setting, it may be that certain *facts* relevant to the disciplinary determination do not come to light until after the formal hearing. It would be unduly restrictive to require that such

The superintendent or his designee shall review each disciplinary action within five days of receipt of the "Finding of Fact, Conclusion and Recommendation" and enter his "Order" which may:

(d) Increase the sanction imposed by the disciplinary committee. When this action is taken the superintendent must state in writing his reasons and immediately notify the inmate, the disciplinary committee and the reporting employe of his action and reasons.

■ Plaintiffs contend that a hearing must be held before the superintendent may, consistent with due process, increase the sanction imposed by the disciplinary committee. They say that to hold otherwise would be to essentially render the disciplinary hearing a sham proceeding. Although most cases do not address this issue, plaintiffs' objections fail to distinguish between determination that a violation has occurred and the imposition of a sanction for that violation. At the disciplinary committee hearing an inmate may controvert or explain the violations alleged in the misconduct report and present evidence of mitigating circumstances.

Once the fact of violation has been established in a proceeding which meets due process requirements in conformance with *Wolff*, the superintendent, as head of the institution, may properly be given the authority to increase the sanction in the light of his experience and knowledge of prison operations. This is particularly true where he is the one with overall responsibility, and who therefore has the broadest, most comprehensive view of the needs of the prison.

G. CASES IN WHICH NO HEARING REQUIRED.

■ Plaintiffs challenged Regulation IV(1)(a) which provides that:

No hearing shall be required for imposition of a disciplinary sanction based upon a criminal conviction for conduct occurring during the period of an inmate's penal custody.

This rule is applicable only to inmates who have already had the opportunity for complete adjudication of their claims in a criminal proceeding providing far greater constitutional safeguards than are required in a disciplinary hearing. Little purpose would be served by rehashing the evidence in a second hearing. Although it might be desirable for prison authorities to conduct an abbreviated proceeding which would allow the inmate to present evidence which is relevant to the proper sanction to be imposed, I do not believe that this is constitutionally required.

II. RULES OF PROHIBITED CONDUCT:

Plaintiffs challenge four of the Rules of Prohibited Conduct. These are set forth below.

Rule 1: DISRUPTIVE BEHAVIOR

No inmate shall engage in the advocation, encouragement, promotion or creation of a disturbance.

A "disturbance" is a substantial disorder characterized by unruly, noisy, or violent conduct which disrupts the orderly administration of the institution or creates an unreasonably annoying condition which poses a direct threat to the security and/or safety of the institution.

Rule 2: UNAUTHORIZED ORGANIZATIONS

No inmate shall promote, create or participate in any inmate club, association or other organization except those specifically approved by the institution superintendent.

Rule 9: DISRESPECT TO ANOTHER

No inmate shall use hostile or abusive language or gestures in communicating to another person.

Rule 11: FALSE STATEMENTS TO STAFF MEMBERS

No inmate shall wilfully make false statements to staff members in regard to information needed for material matters.

■ The challenges to Rules 1, 2 and 9 are based on First Amendment grounds. In

addition, Rules 1, 9 and 11 are claimed to be "void for vagueness."[4]

## A. FIRST AMENDMENT

The Supreme Court has told us that:

A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

In the prison setting restrictions on free speech are justified if two criteria are met:

First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. . . . Second, the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved. *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1972).

 Among the legitimate governmental interests to be considered are:

. . . the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners. Id. at 412, 94 S.Ct. at 1811.

Each of the rules at issue plainly furthers one or more of these legitimate objectives. Nor do I find that they are unconstitutionally overbroad. Each rule restricts freedom of expression no more than is necessary to further legitimate penal objections. It is, after all, a prison, not Hyde Park, that defendants are running.

## B. VAGUENESS

 Unquestionably, criminal statutes must be sufficiently specific that an individual has fair notice of what conduct is forbidden. *United States v. Harriss*, 347 U.S.

612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Some courts have applied the statutory standard to prison rules. *See, e. g. Sands v. Wainwright*, 357 F.Supp. 1062 (M.D.Fla.), *rev'd on other grounds*, 491 F.2d 417 (5th Cir. 1973); *Martinez v. Procunier*, 354 F.Supp. 1092 (N.D.Cal.1973), *aff'd.* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (Because it found adequate First Amendment grounds for affirming the district court decision, the Supreme Court did not reach the vagueness issue.) Other courts have applied the requirement of reasonable specificity but have relaxed it somewhat by balancing the prisoner's rights against the prison system's need for order. *See, e. g., Meyers v. Alldredge*, 492 F.2d 296 (3d Cir. 1974).

Due process requirements are to be flexibly and reasonably interpreted in light of and under all relevant circumstances. Bearing this in mind, I find persuasive the reasoning of the Court in *Meyers v. Alldredge* :

Due process undoubtedly requires certain minimal standards of specificity in prison regulations, but we reject the view that the degree of specificity required of such regulations is as strict in every instance as that required of ordinary criminal sanctions. This results from the fundamental difference between normal society and prison society. The maintenance of *strict security and discipline*, with its unfortunate but unavoidable circumscription of an inmate's freedom to act, *is essential to safe and efficient prison administration.* . . . As such, it is nearly impossible for prison authorities to anticipate, through a narrowly drawn regulation, every conceivable form of misconduct which threatens prison security. (Emphasis supplied.) 492 F.2d at 310.

---

**4.** Specifically, plaintiffs' attack is that the following language is so vague as to render void rules embodying these phrases: "creates an unreasonably annoying condition" in Rule 1;

the language "hostile or abusive language or gestures" in Rule 9; and "material matters" in Rule 11.

■ The constitution does not demand that prison officials perform the "nearly impossible" task of drafting perfect regulations. These rules may not be perfect, but I find them sufficiently specific under these circumstances to pass constitutional muster.

## III. PROCEDURES FOR ADMINISTRATIVE SEGREGATION AND/OR INVOLUNTARY TRANSFER OF INMATES:

These procedures permit transfer of an inmate to another institution or to segregation in the absence of a specific disciplinary rule violation whenever "a superintendent determines that the safety and security of the institution and the best interests of the institution population and the public will be served by transfer or isolation of the inmate." Proc. I(2). The purpose of these procedures is to provide a means for "handling potentially disruptive inmates before actual disruption occurs." Proc. I(1).

The procedures set forth in these regulations vary somewhat from those accorded prisoners charged with disciplinary infractions. A post-transfer hearing is provided, however there are fewer procedural safeguards than in the case of disciplinary actions.[5]

Plaintiffs claim that the same requirements should be imposed whether an inmate is transferred for disciplinary or administrative reasons.

■ Insofar as inter-prison transfers are concerned, plaintiffs' position is foreclosed by Supreme Court decisions in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). In these cases the Court held:

. . . no Due Process Clause liberty interest of a duly convicted inmate is infringed when he is transferred from one prison to another within the State, whether with or without a hearing absent some right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events. 427 U.S. at 242, 96 S.Ct. at 2547.

Under Oregon law the plaintiffs have no right to remain at a particular institution and no justifiable expectation that they will not be transferred except for misconduct.[6]

Plaintiffs' assertions regarding administrative transfers to segregation stand on a somewhat different footing. *Montanye* held that no liberty interest is implicated in inter-institutional transfers whether they are administrative or disciplinary in nature. It is evident, therefore, that the mere labeling of a transfer to segregation as "administrative" is not determinative. Further, the *Montanye* Court carefully noted that no loss of good time or segregated confinement was involved in either *Meachum* or *Montanye*. The focus in these cases was on *the nature of the change* in conditions of confinement, *not* on *the reasons leading to the transfer*. At least three justices apparently believed that constitutional requirements would come into play if transfer to segregation or isolation was involved. Justice Stevens, joined by Justices Brennan and Marshall, wrote in his dissenting opinion in *Meachum* that:

I would certainly not consider every transfer within a prison system, even to more onerous conditions of confinement, such a [grievous] loss. On the other

---

5. Under the administrative transfer regulations:
 1) there is no right to a pre-transfer hearing;
 2) the hearing is conducted by a single hearing officer;
 3) the inmate has no right to call witnesses;
 4) there are no restrictions on the use of unidentified informant testimony.

6. ORS 137.124 provides: (1) If the court imposes a sentence of imprisonment upon conviction of a felony, it shall not designate the correctional facility in which the defendant is to be confined but shall commit the defendant to the legal and physical custody of the Corrections Division.

(2) After assuming custody of the convicted person the Corrections Division may transfer inmates from one correctional facility to another such facility for the purposes of diagnosis and study, rehabilitation and treatment, as best seems to fit the needs of the inmate and for the protection and welfare of the community and the inmate.

hand, I am unable to identify a principled basis for differentiating between a transfer from the general prison population to solitary confinement and a transfer involving equally disparate conditions between one physical facility and another. 427 U.S. at 235, 96 S.Ct. at 2543.

As noted previously, the liberty interest in loss of good time which was afforded protection in *Wolff* was held to be rooted not in the U.S. Constitution but in state law. *Wolff* also held that the same procedural safeguards were required where solitary confinement was the issue. While it is true that in *Wolff* there was also a statutory right not to be placed in isolation except for major misconduct, the holding that the due process requirements were applicable does not appear to rest on that fact. In *Wolff* the Court noted that deprivation of good time does not work any change in the condition of an inmate's liberty, 418 U.S. at 560, 94 S.Ct. 2963, but that solitary confinement represents a "major change" in the conditions of confinement, 418 U.S. at 571, n.19, 94 S.Ct. 2963. And in *Meachum* the Court said that "we cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause." 427 U.S. at 224, 96 S.Ct. at 2538. (Emphasis in original.)

The *Wolff* holding with regard to solitary confinement thus appears to be based on the belief by the Court that transfer to isolation or segregation is such a major change in the conditions of confinement as to constitutionally require due process protections.

The Court's decision in *Baxter v. Palmigiano, supra,* lends further support to this interpretation of *Wolff*. *Baxter* involved confinement in isolation for violation of disciplinary rules. There is no mention in *Baxter*, nor in the two predecessor Ninth Circuit *Clutchette* opinions, of any state law

right not to be confined in isolation. Nevertheless, the Court held that the requirement of *Wolff* were applicable, and further noted that on the record before them it was "unable to consider the degree of 'liberty' at stake in loss of privileges and thus whether some sort of procedural safeguards are due when only such 'lesser penalties' are at stake." 425 U.S. at 323, 96 S.Ct. at 1560. This statement implies that, at least where isolation is involved, constitutionally based liberty interests must be protected.

 I hold therefore that some amount of due process must be afforded inmates faced with administrative transfers to segregation. The question then becomes: What process is due? From the standpoint of the effect on inmates, I am unable to distinguish between solitary confinement for administrative as opposed to disciplinary reasons. However, the rationale behind administrative transfers is that it is necessary for the safety and security of the institution to isolate potentially disruptive inmates. Therefore, it may be that the administrative interest in maintaining internal security and preventing disruption is greater in the cases of administrative transfers.

 In the process of attempting to strike a balance between "institutional needs and objectives and the provisions of the Constitution," *Wolff*, 418 U.S. at 556, 94 S.Ct. at 2975, this factor weighs on the side of effective prison administration. In light of the greater institutional interests which are at stake, I find that the procedures for administrative transfer to segregation adequately protect the due process rights of inmates.[7]

CONCLUSION

This case has been long delayed. I express to all concerned my deep regret for not having completed my work on this opinion sooner. I am aware that prison discipline is a difficult and sensitive area.

---

7. I need not and do not decide today whether any of the procedures followed in disciplinary actions exceed constitutional requirements. Neither do I reach any equal protection issue which may be presented if the state grants only the constitutional minimum in the case of administrative transfer but more than is required where disciplinary action is involved.

Those difficulties and sensitivity call for caution in any judicial participation. Changes which will be necessary in rules by reason of this opinion should be studied carefully.

I ask that counsel confer to see if agreement on proposed changes can be achieved. In doing so, I do not ask either side to waive any rights which it may have to appeal following final judgment. Such conference will not be deemed to be acquiescence in any portion of this ruling by a party aggrieved. If conference seems not to be productive, I ask that counsel notify me, and I will schedule an early conference, and/or further hearings as may be necessary before final judgment is entered.

## ON MOTION FOR PRELIMINARY INJUNCTION

This matter was heard June 19, 1979, upon plaintiffs' motion for preliminary injunction filed June 18, 1979. In order that my ruling on this motion may be properly understood it is necessary to recite in brief form some history of this case.

On April 19, 1979, I issued an opinion in which I held that in certain respects the disciplinary procedures which defendants have used in imposing confinement in segregation for disciplinary violations upon various prisoners (plaintiffs) did not pass constitutional muster. In oversimplified form, my holdings in this respect were four in number as follows:

(a) The disciplinary committee must be impartial; the rule, in terms, does not so provide;

(b) The rules promulgated and used by defendants placing a limit upon inmates' right to call witnesses at disciplinary hearings too broadly restrict the concededly limited right which inmates have in this regard;

(c) Similarly, the rule relating to an inmate's right to present documentary evidence was not sufficiently incorporated in the version of the rules in force as of April 1979;

(d) The manner in which information derived from unidentified informants is used is constitutionally impermissible.

In my ruling of April 19 I urged the parties to confer to see if "agreement on proposed changes can be achieved." What I had hoped might occur would be that defendants might see fit to rewrite some or all of the rules affecting these four areas and thus either avoid an appeal entirely or narrow the scope of issues on any appeal which either side believed ought to be taken.

This process has been under way according to representations furnished by counsel for defendants at the hearing held on plaintiffs' motion for preliminary injunctive relief. That hearing was held in Salem and, as mentioned, on June 19. At that hearing counsel indicated that defendants were undertaking a good faith review of these four areas and were making every effort possible to study revisions of rules in these areas so that as nearly as possible the suggestion which I made might be followed. Counsel was careful to note at the hearing, as he had been careful in earlier informal sessions with court and counsel since April 19, that defendants believed sincerely they could not acquiesce completely in all four of the areas involved. Counsel fully expected that there would be some issues which defendants believed strongly must be made the subject of an appeal to the Court of Appeals. Counsel further advised that defendants believed this rule-making accommodation process would be complete within a period of about 4 to 6 weeks. (I note here that the defendants of course are subject to other constraints besides my opinion, specifically constraints with respect to rule-making power as provided by Oregon administrative procedure statutes, ORS Ch. 183; ORS 421.180 et seq. However, under these statutes, ORS 183.335, defendants may promulgate amendments and put them into effect immediately. Such rules remain effective for a period of 120 days, during which time the ordinary rule-making process may be followed.)

Plaintiffs' request for a preliminary injunction, though filed on June 18, had been preceded by a similar informal request em-

bodied in a letter from counsel for plaintiffs to the court dated May 10, 1979. The colloquy which occurred at the June 19 hearing served to allow each side to urge its position with respect to plaintiffs' motion. It also served to narrow somewhat the nature of plaintiffs' motion. The hearing of June 19 has been transcribed. I will consider the plaintiffs' position as being based upon the June 18 motion in light of the positions urged at the June 19 hearing.

In essence, plaintiffs call for issuance of a preliminary injunction pending entry of final judgment as follows. Plaintiffs contend that all members of plaintiffs class (prisoners) in the three affected institutions who are in segregation must be given new hearings conducted in a manner which complies with the April 19 ruling or be returned to the general population. Plaintiffs' motion asks for an injunction ordering that this occur within 7 days. I add that plaintiffs' counsel candidly admit that it is possible and even likely that in some, perhaps many, instances, the rehearing if conducted in accordance with the April 19 ruling would serve simply to reaffirm the original decision of the disciplinary committee which produced the sentence to segregation.

At the June 19 hearing I inquired of counsel as to the approximate number of persons then in segregation in each of the three institutions. Counsel expressed the opinion that there were probably approximately 125 to perhaps as many as 150 prisoners in segregation in all three institutions. At the June 19 hearing I asked Mr. McAlister (defense counsel) to furnish to the court by June 22 a list of names of persons in segregation as of June 22 and who, assuming no reductions in their segregation sentences, would still be in segregation on August 1, 1979.[1]

The list which was filed with the court indicates that there are 62 such persons in segregation in Oregon State Penitentiary, 52 such persons in Oregon State Correctional Institution, and 3 such persons in Oregon Women's Correctional Center. On June 29, 1979, I requested Mr. McAlister's office to furnish additional information. I requested the figures as to the total population of each of the three institutions as of June, 1979 and also a list of names of persons or a total number of persons in segregation in each of the three institutions who, indulging the same assumptions as were previously indulged, would still be in segregation as of October 1, 1979. In addition, I requested that Mr. McAlister's office furnish this information to me by telephone, since I am presently out of the district, and also to furnish it in writing to my office.

This added information is summarized as follows:

| Institution | Total | Inside Population | Segregation | Segregation August 1 | Segregation October 1 |
|---|---|---|---|---|---|
| OSP | 2,066 | 1,454 | 71 | 62 | 42 |
| OSCI | 952 | 755 | 62 | 52 | 26 |
| OWCC | 128 | 72 | 4 | 3 | 1 |

██ The contentions of the opposing sides as to whether I should grant or deny the preliminary injunctive relief sought are set forth in full in the June 19 transcript. I will refer only to some in this opinion though I have considered all of the contentions made. In essence of course the plaintiffs' position is that the 125 persons in segregation at the present time were placed there by the use of procedures which do not comport with constitutional standards. Very simply, plaintiffs say that defendants cannot constitutionally allow those persons to be deprived of the limited liberties they

1. As Mr. McAlister pointed out, some persons are committed to segregation with, for example, a sentence of 14 days in segregation with 3 months in segregation suspended on the condition that the individual will maintain good conduct in the segregation unit. Such is regarded as a 14–day sentence rather than a sentence of 3 months plus 14 days.

possess as prisoners by procedures which do not meet constitutional standards. Plaintiffs say that both law and equity call for either a new hearing or a return to the general population.

Defendants contend first that issuance of the requested preliminary injunctive relief would be rigid and counterproductive. Defendants emphasize that, since the grant of a preliminary injunction is appealable under 28 U.S.C. § 1292(a), and since they have sincerely concluded they cannot, absent an appeal, live with my April 19 opinion in its entirety, issuance of the requested preliminary injunction would force them to appeal immediately and in conjunction therewith to seek, either from this court or from the Court of Appeals, a stay in the effectiveness of the injunction pending the canvass of that ruling by the Court of Appeals. Secondly, issuance of an injunction would necessarily produce an immediate termination of the accommodation process which defendants say they are sincerely pursuing and which will have run its course within a period of about 4 to 6 weeks after the June 19 hearing. Furthermore, defendants argue that they have been following a set of rules which since 1975 have passed constitutional muster at least in the eyes of the Oregon Supreme Court. They argue that it would be an extraordinary step for this court to take to immediately (and, in effect, retroactively) enforce a set of stricter rules upon defendants as to prisoners in segregation for disciplinary reasons as an overall part of the complex and difficult processes which defendants are charged with in operating prisons.

An added complication in evaluating this motion stems from recent Ninth Circuit case law, namely *Milhollin v. Ford Motor Credit Co.*, 588 F.2d 753 (9th Cir. 1978), cert. granted on other issues, —— U.S. ——, 99 S.Ct. 2880, 61 L.Ed.2d 309 (1979); *Kessler v. Associates Financial Services Co.*, 574 F.2d 577 (9th Cir. 1978). The upshot of these cases is that doctrines which limit the retroactivity of judicial decisions are grist for the mill of appellate courts only; district courts have no power to limit the application in the district of new procedures and rules resulting from district court decisions. I note here that counsel for defendants do not argue for any contrary result once the final judgment is entered. Counsel for defendants candidly state that at that juncture the path to follow for defendants is clear. At that point defendants may either comply or appeal from some or all of the provisions of the final judgment.

It is uncertain in my mind whether *Milhollin* and *Kessler* are intended to operate so as to deprive a court of equity of the usual broad discretion which it has in evaluating requests for injunctive relief, whether the injunction sought be either preliminary or final. See for example: *Hutto v. Finney*, 437 U.S. 678, 687 n.9, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Spain v. Procunier*, 600 F.2d 189, at 194 (9th Cir. 1979); *Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978). It seems to me, however, particularly in the delicate and sensitive field of judicial oversight of prison operations,[2] the Ninth Circuit could not possibly have intended the *Kessler* doctrine to eliminate entirely the discretion possessed by a court of equity in evaluating the request made here by plaintiffs. To do so would be to turn a judge into a non-judge. It would impose a freeze upon flexibility that otherwise is a hallmark of the exercise of judicial discretion. Since it seems likely, based upon the record made thus far, that defendants' rule-rewriting process will be complete by approximately August 1, 1979, permitting the entry of a final judgment within a relatively few days after that, prudence and discretion call for the denial rather than the granting of the plaintiffs' requested preliminary injunctive relief. Accordingly, therefore, the plaintiffs' motion filed June 18, 1979, is denied. The foregoing constitute Findings of Fact and Conclusions of Law pursuant to the provisions of Rule 52, Fed.R.Civ.P. The clerk will set this matter for further hearing at the earliest possible date after August 1, 1979. Each side is invited to tender proposed forms of final judgment.

2. See *Bell v. Wolfish*, —— U.S. ——, 99 S.Ct.1861, 1866, 60 L.Ed.2d 447 (1979).